IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Victoria R. Mowbray,<br>on behalf of C.C.M., a minor,     ) | Civil Action No. 6:07-0819-JFA-WMC |
| )<br>Plaintiff,   ) | |
| )<br>vs.      ) | **REPORT OF MAGISTRATE JUDGE** |
| )<br>Michael J. Astrue,   ) | |
| Commissioner of Social Security,   ) | |
| )<br>Defendant.   ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Titles II and XVI of the Social Security Act on behalf of her minor child.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for supplemental security income (SSI) benefits on behalf of C.C.M., her minor child, ("the claimant") on October 6, 2004. The application was denied initially and on reconsideration by the Social Security Administration.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

On July 5, 2005, the plaintiff requested a hearing. The administrative law judge, before whom the claimant, the claimant's attorney, and the plaintiff appeared on March 6, 2006, considered the case *de novo*, and on July 28, 2006, found that the claimant was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on January 23, 2007. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant was born on April 18, 2000. Therefore, he was a preschooler on October 6, 2004, the date the application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2).
>
> (2)    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 916.972).
>
> (3)    The claimant has the following severe impairments: Attention deficit hyperactivity disorder (ADHD) and a mood disorder (20 CFR 416.924(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).
>
> (5)    The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).
>
> (6)    The claimant has not been disabled, as defined in the Social Security Act, since October 6, 2004, the date the application was filed (20 CFR 416.924(a)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

2

**APPLICABLE LAW**

An individual under age eighteen will be considered disabled if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(I). The Commissioner's regulations require the ALJ to apply a three-part test: (1) determine whether the child is currently engaged in substantial gainful activity. If so, he is not disabled; if not, (2) determine whether the child has a severe impairment or impairments. If not, he is not disabled; if so, (3) determine whether the child's impairments meet, medically equal or functionally equaled any listed impairment. If not, he is not disabled. *See* 20 C.F.R. § 416.924(b)-(d).

If the claimant's impairment or combination of impairments does not meet or medically equal the requirements of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1, the Commissioner will decide whether it results in limitations that functionally equal such requirements. *See id.* § 416.926a(a). To establish functional equivalence, the claimant must have a medically determinable impairment or combination of impairments that results in "marked" limitations in two domains or an "extreme" limitation in one domain. *See id.* The Commissioner will find that the claimant has a "marked" limitation in a domain when the claimant's impairment or combination of impairments interferes seriously with his ability to independently initiate, sustain, or complete activities. *See id.* § 416.926a(e)(2)(I). "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme," and may arise when several activities or functions are limited or when one is limited. *See id.*

The Commissioner will find that the claimant has an "extreme" limitation in a domain when the claimant's impairment or combination of impairments interferes very seriously with his ability to initiate, sustain, or complete activities independently. *See id.* § 416.926a(e)(3)(I). "Extreme" limitation also means a limitation that is "more than marked," and may arise when several activities or functions are limited or when one is limited. *See id.*

3

The Commissioner considers how the claimant functions in activities in terms of six domains- broad areas of functioning intended to capture all of what a child can or cannot do. *See id.* § 416.926a(b)(1). These domains are:

(1)     **Acquiring and using information.** In this domain, the Commissioner considers how well the claimant acquires or learns information, and how well the claimant uses the information he has learned. *See id.* § 416.926a(g). For preschool children (age 3 to attainment of age 6), when the claimant is old enough to go to preschool or kindergarten, [he] should begin to learn and use the skills that will help [him] to read and write and do arithmetic when [he] [is] older. For example, listening to stories, rhyming words, and matching letters, counting, sorting shapes, building with blocks, painting, coloring, copying shapes, using scissors, using words to ask questions, giving answers, following directions, describing things, explaining what he means, and telling stories. *See id.* § 416.926a(g)(2)(iii).

(2)     **Attending and completing tasks.** In this domain, the Commissioner considers how well the claimant is able to focus and maintain attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them. *See id.* § 416.926a(h). For preschool children [he] should be able to pay attention when [he] [is] spoken to directly, sustain attention to [his] play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. [He] should also be able to focus long enough to do many more things by [him]self, such as getting [his] clothes together and dressing [him]self, feeding [him]self, or putting away [his] tops. [He] should usually be able to wait [his] turn and to change [his] activity when a caregiver or teacher says it is time do something else. *See id.* § 416.926a(h)(2)(iii).

(3)     **Interacting and relating with others.** In this domain, the Commissioner considers how well the claimant initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. *See id.* § 416.926a(I). For preschool children, the claimant should be able to socialize with children as well as adults. [He] should prefer playmates [his] own age and start to develop friendships with children who are [his] age. [He] should be able to use words instead of

4

actions to express [him]self, and also be better able to share, show affection, and offer to help. [He] should be able to relate to caregivers with increasing independence, choose [his] own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. [He] should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what [he] say[s] most of the time. *See id*. § 416.926a(i)(iii).

(4)    **Moving about and manipulating objects.** In this domain, the Commissioner considers how the claimant moves his body from one place to another and how he moves and manipulates things. *See id*. § 416.926a(j). For preschool children, the claimant should be able to walk and run with ease. [His] gross motor skills should let [him] climb stairs and playground equipment with little supervision, and let [him] play more independently; e.g., [he] should be ale to swing by [him]self and may start to ride a tricycle. [His] fine motor skills should also be developing. [He] should be able to complete puzzles easily, string beads, and build with an assortment of blocks. He should be showing increasing control of crayon, markers, and small pieces in broad games, and should be able to cut with scissors independently and manipulate buttons and other fasteners. *See id*. § 416.926a(j)(iii).

(5)    **Caring for himself.** In this domain, the Commissioner considers how well the claimant maintains healthy emotional and physical state. *See id*. § 16.926a(k). For preschool children, the claimant should want to take care of many of [his] physical needs [him]self (e.g., putting on [his] shoes, getting a snack), and also want to try doing some thing that [he] cannot do fully (e.g., tying [his] shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for [him] to agree to do what [his] caregiver asks. Later, that may be difficult for [him] because [he] want[s] to do things [his] way or not at all. *See id*. § 416.929a(k)(iii).

(6)    **Health and physical well-being.** In this domain, the Commissioner considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the claimant's functioning not considered in 20 C.F.R. § 416.926a(j). *See id*. § 416.929a(l). A physical or mental disorder may have physical effects that cause difficulty in performing activities independently or effectively; medication or other treatment may have physical effects that limit performance of activities; or an illness may be chronic with

5

stable symptoms or episodic with periods or worsening and improvement. *See id.* § 416.929a(l)(1)-(3).

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The claimant was born in April 2000; he was four years old at the time the plaintiff alleged he became disabled and six years old at the time of the ALJ's decision (Tr. 26, 62). The plaintiff alleges that the claimant became disabled on November 1, 2004, due to attention deficit hyperactivity disorder and bipolar disorder (Tr. 110).

6

### *Evidence Considered By The ALJ*

On May 7, 2004, the claimant began treatment at Regional Mid-Shore Mental Health Services for allegedly hitting and bitting himself, and fighting with his brother (Tr. 177). A couple of weeks later, Betty Clendaniel, the claimant's teacher, reported to Mike Campbell, a licensed social worker at Regional Mid-Shore Mental Health Services, that, although the claimant was a "bit behind," he was progressing and was "very active," cooperative with the rules, calmer, and responding to structure (Tr. 181). The claimant continued treatment with Regional Mid-Shore Mental Health Services, and in July 2004, Dr. Craig Wessells assessed the claimant a Global Assessment of Functioning (GAF) score of 55, indicating moderate symptoms, "(e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning, (e.g., few friends, conflicts with peers or coworkers))." American Psychiatric Association, *Diagnostic and Statistic Manual of Mental Disorder* (DSM-IV, Global Assessment of Functioning Scale (4th ed. 1994).

On September 9, 2004, Dr. Arvoranee Pinit evaluated the claimant for complaints of behavioral problems. The plaintiff reported that the claimant had been in therapy with Mr. Campbell since April 2004, and that he had problems with fighting his brother and staying on task. The plaintiff reported that the claimant attended pre-kindergarten and Head Start, but that the school had not complained about the claimant's behavior. Examination revealed no significant physical abnormalities. He could hop with one foot but had difficulty with fine motor control. He could imitate building an age-appropriate gate and answer age-appropriate questions. The plaintiff completed the DuPaul Behavior Rating Scale, which showed that the claimant was at the lower end of the scales. His hyperactivity score was at the 97 percentile, and his inattentive score was at the 96 percentile with a total score of 99 percentile. Dr. Pinit noted that the claimant's history was compatible with attention deficit hyperactivity disorder, but that he did "pretty

7

well" in a one-on-one situation with only "mild" hyperactivity noted.  Dr. Pinit diagnosed attention deficit hyperactivity disorder, combined typed, and prescribed Clonidine for sleep (Tr. 188-91).

Clinical notes from Mr. Campbell dated August and September 2004 indicated the claimant had improved his self-injurious behavior, and that he was focusing and listening better (Tr. 173-76).  Progress notes from Mr. Campbell dated October through December 2004 indicated the plaintiff noticed some minor improvement in the claimant's behavior, but that he was still having problems fighting his brother and engaging in self-injurious behavior (Tr. 169-72).

On November 1, 2004, the plaintiff took the claimant to see Cynthia Gower, M.A., a behavioral specialist.  The plaintiff reported that the claimant attended Head Start and pre-kindergarten and was successful and doing well in both environments.  He enjoyed riding his bike and playing games, such as hide and seek.  The plaintiff also reported that the claimant was a "pretty happy child most of the time" and that his behavioral problems usually began when he came home from school (Tr. 182-84).

On December 20, 2004, the claimant's pre-kindergarten teacher from Ridgely Elementary completed a teacher questionnaire.  The questionnaire indicated that the claimant had no problems in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, or caring for himself.  With regard to the domain of health and physical well-being, it was noted that the claimant hit himself, ate foreign objects and had conversations with imaginary friends and pets (Tr. 124-31).

A clinical note from Dr. Pinit dated January 6, 2005, indicated that the claimant was quiet and calmer, and that his mood was "ok."  Dr. Pinit noted no behavioral or academic problems, and indicated that the claimant's behavior varied, with some days being calmer than others.  Dr. Pinit prescribed Adderall (Tr.185).

8

Three days later, on January 10, 2005, Marilyn Dorsen, Ph.D., a State agency psychological consultant, reviewed the claimant's record and completed a "Childhood Disability Evaluation Form." Dr. Dorsen found that the claimant had no limitations in the domains of acquiring and using information, interacting and relating with other, moving about and manipulating object, and caring for himself; and less than marked limitations in attending and completing tasks. Dr. Dorsen noted that the claimant's teacher reported that he was in regular classes and had no problems except for pica.[2] Dr. Dorsen opined that with medication, the claimant made a good adjustment at school, and that there had been no complaints by his teacher. Dr. Dorsen concluded that, "although he is reported [to be] hyperactive, there is no indication of serious impulsiveness or risky behavior." Dr. Dorsen opined that, while the claimant's impairment or combination of impairments was severe, they were not severe enough to meet, medically equal or functionally equal the Listing (Tr. 201-06).

On March 22, 2005, Ms. Clendaniel completed a teacher questionnaire indicating that she had observed the claimant on and off of medication, and that medication caused a "great detrimental change in his behavior." In the domain of acquiring and using information, Ms. Clendaniel indicated that the claimant had no problems until he was placed on medication. She reported that the claimant did not participate in group time, and was "constantly irritable" and "easily frustrated." In the domain of attending and completing tasks, Ms. Clendaniel indicated that problems functioning in this domain were not evident until the claimant was placed on medication, and that now he had an obvious problem in refocusing, waiting to take turns, changing from one activity to another without being disruptive, and working without distracting himself or others. Ms. Clendaniel noted no

---

[2]Pica is an eating disorder manifested by a craving to ingest any material not normally considered as food, including starch, clay, ashes, toy balloons, crayons, cotton, grass, cigarette butts, soaps, twigs, wood, paper, metal or plaster. *See Taber's Cyclopedic Medic Dictionary* (*Taber's*) (20th ed. 2005), *available on* Stat!Ref Library CD-ROM (Fourth Qtr. 2007).

problems in the domain of interacting and relating with others, but that he had some obvious problems in moving about and manipulating objectives, such as managing pace of physical activities or tasks and integrating sensory input with motor output.  In the domain of caring for himself, Ms. Clendaniel noted that since the claimant started medication he had very serious problems in handling frustration appropriately, caring for his physical needs (e.g. dressing and eating), identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and using appropriate coping skills to meet daily demands of school environment.  In the domain of medical condition and health and physical well being, Ms. Clendaniel noted that medication had a negative effect on his behavior (Tr. 137-44).

The following day, on March 23, 2005, Ms. Clendaniel wrote a "Dear Doctor" letter in which she indicated that she had been the claimant's teacher for two years and that she noticed a change in his behavior since he was placed on medication.  According to Ms. Clendaniel, the claimant's was "full of energy," participated fully, interacted and advanced questions during group time, and was a self-learner.  However, after he was started on medication, he became withdrawn and less sociable with other children, and he refused to follow or participate in classroom rules and routines (Tr. 151).

On April 29, 2005, Kathryn M. Bugbee, Ph.D., a State agency psychological consultant, reviewed the claimant's record and completed a "Childhood Disability Evaluation Form."  Dr. Bugbee found that the claimant had no limitations in the domains of acquiring and using information, moving about and manipulating objects, caring for himself, and in health and physical well-being; and less than marked limitations in the areas of attending and completing tasks and interacting and relating with others (Tr. 209-14).

On May 9, 2005, the claimant underwent a psychiatric evaluation performed by Dr. Wessells.  The plaintiff reported that the claimant experienced behavioral problems in school, and had been impulsive and hyperactive since he began to walk.  The plaintiff

10

reported that the claimant took Adderall, which helped his behavior some, but that he still had mood liability and a temper.  Examination showed a wide range of affect, from anger to happiness.  The claimant was "somewhat oppositional with his mother, and there were no psychotic symptoms or hallucinations.   Dr. Wessells noted that the claimant was impulsive by history.  He diagnosed the claimant with a mood disorder, oppositional defiant disorder, and attention deficit hyperactive disorder by history.  The claimant was assessed a GAF score of 45/50 (Tr. 217), indicating serious problems "(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social occupational or school functioning (e.g., no friends, unable to keep a job)."  *See* DSM-IV, *supra* at 2.  Dr. Wessells recommended Risperdal as a mood stabilizer instead of Clonidine (Tr. 216-18).

Treatment notes from Dr. Pinit dated July and September 2005 indicated that the claimant was still having behavioral problems and was "very active."  The plaintiff reported that the claimant jumped from the couch to the ottoman and injured his ankle, and that he had still refused to pay attention or listen.  Dr. Pinit discontinued the prescription for Clonidine and prescribed Risperdal (Tr. 219-20).

In February 2006, the claimant underwent another evaluation by Don Godbey, a licensed social worker.  The diagnoses for the claimant were attention deficit hyperactivity disorder by history and mood disorder by history.  Mr. Godbey assigned the claimant a GAF score of 62, indicating only mild symptoms "(depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships)" (Tr. 229-32).  *See* DSM-IV, *supra* at 2.

### Evidence Before The Appeals Council

On June 21, 2006, Dr. Amy Levenson noted that the claimant had improved behavior with an increase in Adderall-XR.  She noted that he was able to complete school

11

work with fewer behavioral difficulties and was redirectable.  According to Dr. Levenson, although the family had few structured activities at homes, the claimant was stable (Tr. 240).

Clinical notes from Dr. Levenson dated July 31, 2006, indicated that the claimant remained "fairly stable" but struggled with more behavioral difficulties over unstructured summer months.  She noted that the claimant was talkative and redirectable (Tr. 239).

Progress notes from Mr. Godbey dated August 2, 2006, indicated that the claimant had limited structure and self control.  His mood was fairly stable, but the plaintiff was still concerned about his behavior (Tr. 238).

That following month, the claimant presented to Dr. Levenson on September 25, 2006 , for medication management.  Dr. Levenson noted that the claimant was in the first grade and had "significant behavioral difficulty" at school; however, the claimant was reluctant to discuss his behavioral problems.  Dr. Levenson continued his Adderall and slightly increased the Risperdal (Tr. 237).

In October 2006, Dr. Levenson indicated that the claimant showed "reasonable gains in controlling his behavior over the past month," and the overall impression was "improved."  The claimant reported that he did better at school when he took his medication (Tr. 235).

The plaintiff also submitted records from Bryson Elementary School covering the period of June 10, 2004, through September 25, 2006 (Tr. 244-53).


**_Hearing Testimony and Other Statements_**

At the March 6, 2006, administrative hearing, the plaintiff testified that it took the claimant a "really long time to focus on anything," and that he got "very irritable" (Tr. 41). The plaintiff testified that the claimant knew his colors and was able to speak in sentences

(Tr. 41-42). The plaintiff stated that the claimant did not have any problems riding the bus to school (Tr. 44).

The plaintiff testified that the claimant fought with his younger brother, but got along with his younger sister (Tr. 44). She claimed that she did not know if he fought with his friends (Tr. 44-45). The plaintiff stated that the claimant played with younger relatives but had problems sharing (Tr. 45). She stated that she was not sure if he had problems getting along with other children at school (Tr. 45-46).

The plaintiff testified that the claimant was potty-trained during the day but wore pull-ups at night (Tr. 47). She further testified that he could dress himself and brush his teeth, but needed help with bathing (Tr. 47).

The plaintiff claimed that without medication the claimant would awaken around 3:00 or 4:00 in the morning. The plaintiff admitted that the claimant's behavior was better with medication, and that she had not noticed any side effects from his medications (Tr. 48-49). The plaintiff also stated that therapy was helping the claimant's behavior "somewhat" (Tr. 50).

On examination by the attorney, the plaintiff testified that the claimant irritated people, hit himself, and sometimes ate paper and styrofoam products (Tr. 51-52). Later the plaintiff testified that she was not sure if the claimant was still disruptive to others (Tr. 53). The plaintiff also testified that the claimant experienced mood swings and had difficulty sleeping through the night (Tr. 56-57).

## ANALYSIS

As discussed above, an application for supplemental security income (SSI) was protectively filed by the plaintiff, Victoria Mowbray, on October 6, 2004, on behalf of her minor son, C.C.M., the claimant. The plaintiff alleges that C.C.M. became disabled on November 1, 2004, due to attention deficit hyperactivity disorder ("ADHD") and a mood

disorder.  The claim was initially denied on January 14, 2005, and upon reconsideration on May 6, 2005.  A video conference was held on March 6, 2006, to determine disability.  On July 28, 2006, the administrative law judge ("ALJ") found that the plaintiff was not disabled. The ALJ concluded that the claimant suffers from severe impairments of ADHD and a mood disorder, but he does not suffer from an impairment or combination of impairments which medically meet or equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The plaintiff filed an appeal on November 29, 2006, to include additional evidence.  The Appeals Council denied review on January 23, 2007.  The plaintiff alleges that the ALJ erred by (1) finding that the claimant did not meet or medically equal listing 112.04; (2) finding that the claimant's impairments did not functionally equal a listed impairment; (3) failing to obtain a consultative examination; and (4) failing to properly consider all medical evidence and considering the medical records incorrectly.

### Listing 112.04

The plaintiff contends that C.C.M.'s impairments medically equal a listed impairment and that substantial evidence does not exist to support the ALJ's conclusion to the contrary.  Specifically, the plaintiff argues that the ALJ erred in finding that C.C.M.'s impairments did not meet or medically equal Listing 112.04 for mood disorder in 20 C.F.R. pt. 404, subpt. P, appt. 1 (Tr. 18).  To meet or medically equal the mood disorder listing, a claimant must satisfy two separate prongs.  The required level of severity for disorders under section 112.04 is met when the requirements in *both* subsections in A and B are satisfied.  *See* 20 C.F.R pt. 404, subpt. P, app. 1, § 112.04.  Listing 112.04 *Mood Disorders* reads as follows:

> Characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome.

14

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A.    Medically documented persistence, either continuous or intermittent of one of the following:

    1.    Major depressive syndrome, characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:

        a.    Depressed or irritable mood; or
        b.    Markedly diminished interest or pleasure in almost all activities; or
        c.    Appetite or weight increase or decrease, or failure to make expected weight gains; or
        d.    Sleep disturbance; or
        e.    Psychomotor agitation or retardation; or
        f.    Fatigue or loss of energy; or
        g.    Feelings of worthlessness or guilt; or
        h.    Difficulty thinking or concentrating; or
        I.    Suicidal thoughts or acts; or
        j.    Hallucinations, delusions, or paranoid thinking; or

    2.    Manic syndrome, characterized by elevated, expansive, or irritable mood, and at least three of the following:

        a.    Increased activity or psychomotor agitation; or
        b.    Increased talkativeness or pressure of speech; or
        c.    Flight of ideas or subjectively experienced racing thoughts; or
        d.    Inflated self-esteem or grandiosity; or
        e.    Decreased need for sleep; or
        f.    Easy distractibility; or
        g.    Involvement in activities that have a high potential of painful consequences which are not recognized; or
        h.    Hallucinations, delusions, or paranoid thinking; or

    3.    Bipolar or cyclothymic syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and

currently or most recently characterized by the full or partial symptomatic picture of either or both syndromes);

and

B.    For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.04.

The ALJ concluded that the claimant did not meet the requirements in subsection B, which requires two of the criteria in Paragraph B2 of Listing 112.02.  The criteria found in Paragraph B2 of Listing 112.02 (*Organic Mental Disorders* listing) are:

a.    Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b.    Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of child, when such information is needed and available) and including, if necessary, the results of appropriate standardized test; or

c.    Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d.    Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.02(B)(2).

16

Under the rules as expressed in § 416.926a, a child will be found to have a "marked" limitation when the impairment interferes seriously with the child's ability to "independently initiate, sustain, or complete activities." *Id.* at § 416.926a(e)(2). Further, marked limitation means a limitation that is "'more than moderate' but 'less than extreme.'" *Id.*

The ALJ found that C.C.M. did not have a "marked" limitation in at least two of the age-appropriate categories: cognitive/communicative functioning; social functioning, personal functioning, or maintaining, concentration, persistence, or pace (Tr. 18). When the ALJ considered whether C.C.M.'s impairment satisfied the adult listing under section 12.04, he found that C.C.M. had only a mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation (Tr. 18). The plaintiff argues that the ALJ erred and that marked imitations do exist in the claimant's social functioning and in concentration, persistence, and pace.

Substantial evidence supports the ALJ's finding. For example, with regard to cognitive and communicative functioning, the evidence showed that C.C.M. was successful in both pre-kindergarten and Head Start (Tr. 183). A teacher questionnaire dated December 2004 indicated that C.C.M. had no problems with acquiring and using information or attending and completing tasks (Tr. 124-31). The plaintiff also testified that C.C.M. knew his colors and was able to speak in sentences (Tr. 41-42). With regard to social functioning, although C.C.M. fought with his younger brother, he basically got along with his younger sister and played with younger relatives (Tr. 44-45). He rode the school bus without any problems (Tr. 45-46). With regard to personal functioning, although C.C.M. hit himself at times, treatment notes from Mr. Campbell dated August and September 2004 indicated that C.C.M.'s behavior had improved, and the plaintiff testified, as late as March 2006, that medication and therapy were helpful in controlling C.C.M.'s behavior (Tr. 48-50).

17

In addition, the plaintiff testified that C.C.M. was potty-trained during the day and could dress himself and brush his teeth, but needed help with bathing (Tr. 47).  With regard to concentration, persistence and pace, the plaintiff told Ms. Gower in November 2004 that C.C.M. was a "pretty happy child most of the time, and enjoyed riding his bike and playing games such as hide and seek (Tr. 184).  She also told Ms. Gower that C.C.M.'s behavior problem usually began when he came home from school (Tr. 184).  Treatment notes from C.C.M.'s treating physician indicated that C.C.M. did not have academic problems in school (Tr. 185), which would suggest that he was able to concentrate and persist at a sufficient pace to complete school work.  Based upon the foregoing, substantial evidence supports the ALJ's finding that C.C.M.'s impairments did not meet or medically equal a listed impairment.

### *Functional Equivalence*

The plaintiff next argues that the ALJ erred in finding that C.C.M.'s impairments did not functionally equal a listed impairment.  Functional equivalence requires a finding of at least one "extreme" limitation in any broad area of functioning or development or two "marked" limitations in two broad areas of functioning or development.  *See* 20 C.F.R. § 416.926a.  In evaluating whether C.C.M.'s impairments functionally equaled a listed impairment, the ALJ found no limitations in the domains of acquiring and using information, moving about and manipulating objects or caring for himself; and less than marked limitations in the domains of attending and completing tasks, interacting and relating with others, and health and physical well-being (Tr. 19-25).

Substantial evidence supports the ALJ's decision.  In assessing C.C.M.'s ability to acquire and use information, the evidence showed that he had no limitation in this domain.  Although C.C.M. had some behavioral problems at home, at school he did well for the most part (Tr. 183).  During his evaluation with Dr. Pinit, he answered age-appropriate

18

questions and built an age-appropriate gate (Tr. 189-90). The plaintiff testified that C.C.M. knew his colors and sentences (Tr. 41-42). His pre-kindergarten teacher noted in December 2004 that C.C.M. had no problems acquiring and using information (Tr. 125-29), and Dr. Pinit, as late as January 2005, indicated that C.C.M. had no academic problems reported (Tr. 185). Ms. Clendaniel noted in March 2005 that C.C.M. had some problem in acquiring and using information while taking medication. However, the plaintiff testified that medication helped C.C.M.'s behavior (Tr. 48-49). The Commissioner may rely on the plaintiff's own statement in evaluating disability. *See McKinney v. Apfel*, 228 F.3d 860, 8763 (8th Cir. 2000). Further, Ms. Clendaniel's questionnaire was completed prior to a change in medication, and treatment notes documented improvement in C.C.M.'s behavior with this medication (Tr. 216-19, 235, 237, 239, 240). The ALJ's finding of no limitations in this domain was also bolstered by two State agency psychologists who found that C.C.M. had no limitation in acquiring and using information (Tr. 203-04, 211-12). The Commissioner can consider the opinions of State agency physicians as evidence in evaluating an individual's claim of disability under the Act. *See* Social Security Ruling 96-6p, 1996 WL 374180 (opinions of State agency medical consultants must be considered and weighed as those of highly qualified experts in the evaluation of medical issues in disability claims under the Act). Thus, substantial evidence supports the ALJ's determination that C.C.M. had no limitation in this domain.

With regard to C.C.M.'s ability to attend and complete tasks, evidence showed that he had less than marked limitation in this area. The plaintiff reported to Ms. Gower that C.C.M. enjoyed riding his bike and playing games, such as hide and seek (Tr. 184). Clinical notes from Mr. Campbell dated August and September 2004 indicated that C.C.M.'s focusing and listening skills had improved (Tr. 173-76). Dr. Pinit noted in his September 2004 evaluation that C.C.M. did "pretty well" in one-on-one situations with only "mild" hyperactivity noted (Tr. 190). Furthermore, Dr. Dorsen, a non-examining physician noted

that, although hyperactivity was reported, there was no indication of serious impulsiveness or risky behavior (Tr. 206), and that C.C.M. had less than a marked limitation in attending and completing tasks (Tr. 203-04). C.C.M.'s pre-kindergarten teacher indicated no problems in this domain (Tr. 125-29). C.C.M.'s kindergarten progress report showed that he was progressing in his ability to pay attention in large and small group activities and his ability to complete tasks appropriately in the time allowed (Tr. 155). Substantial evidence supports the ALJ's conclusion that C.C.M. had less than marked limitation in the area of attending and completing tasks (Tr. 20).

With regard to interacting and relating to others, the ALJ's finding of a less than limitation in this domain was supported by substantial evidence as well (Tr. 21). In assessing C.C.M.'s functioning in this domain, the ALJ considered the plaintiff's testimony that C.C.M. got into fights with his brother but generally got along with his sister (Tr. 44). School records did not reflect a serious concern in this area of functioning (Tr. 125-29, 140-41). The plaintiff further testified that C.C.M. played with relatives but did not like to share, and that she was unsure if C.C.M. had problems getting along with other children at school (Tr. 45-46). An examination by Dr. Wessells showed that C.C.M. had a range of affect from anger to happiness, and that he was somewhat oppositional with his mother (Tr. 217). C.C.M.'s pre-kindergarten teacher indicated no problems in this domain (Tr. 125-29). Further, Ms. Clendaniel, C.C.M.'s Head Start teacher, indicated that he had no problems in this domain (Tr. 140). The ALJ's finding in this domain was further supported by the State agency psychologist who reviewed the evidence and found that C.C.M. had less than marked limitation in the domain of interacting and relating with others (Tr. 211-12). Thus, the ALJ's finding was supported by substantial evidence.

Regarding the domain of moving about and manipulating objects, substantial evidence supports the ALJ's determination that C.C.M. had no limitations in this domain. C.C.M. enjoyed riding his bike and playing games, such as hide and seek (Tr. 184). Dr.

Pinit indicated that C.C.M.'s examination revealed no significant physical abnormalities (Tr. 189-90).  C.C.M.'s pre-kindergarten teacher indicated no problems in the domain of moving about and manipulating objects (Tr. 125-29).  Although Ms. Clendaniel noted that C.C.M. had obvious problems in managing pace of physical activities and integrating sensory input with motor output, she noted he had no problem with moving from one place to another; moving and manipulating things; demonstrating strength, coordination, dexterity in activities; showing a sense of body's location and movement in space; and planning, remembering, and executing controlled motor movements (Tr. 141).  Further, C.C.M.'s kindergarten teacher opined that he had consistently demonstrated skill in moving with balance and control, using eye-hand coordination to perform, and performing self-care tasks competently (Tr. 155).

With regard to the domain of caring for himself, substantial evidence supports the ALJ's determination that C.C.M. had no limitation in his domain of functioning (Tr. 23). For instance, while C.C.M. sometimes wore pull-ups at night due to bed wetting, he was basically potty-trained during the day, was able to bathe himself with assistance, dress himself, and brush his teeth (Tr. 47).  C.C.M.'s pre-kindergarten teacher indicated no problems in the domain of caring for himself (Tr. 125-29).  Although Ms. Clendaniel indicated that C.C.M. had serious problems in caring for himself after he started taking medication, the ALJ noted (Tr. 24) that Ms. Clendaniel's questionnaire was completed prior to a change in medication from Clonodine to Risperdal, and treatment notes documented improvement in C.C.M.'s behavior with this medication (Tr. 216-19, 235, 237, 239, 240). Further, C.C.M.'s kindergarten teacher opined that he had consistently demonstrated skill in performing self-care tasks competently (Tr. 155).

In the domain of health and physical wellbeing, the ALJ determined that C.C.M. had less than marked limitations in this domain, and substantial evidence supports this determination.  For example, the plaintiff testified that C.C.M. experienced no adverse

side effects from his medication (Tr. 48-49).  The plaintiff also testified that sometimes C.C.M. ate inappropriate objects, but that medication and therapy were helping his behavior (Tr. 48-50, 52).  While he had problems sleeping, medication was also effective in resolving this problem (Tr. 48).  *See Gross v. Heckler*, 785 F.2d 1163,1166 (4ᵗʰ Cir. 1986) (a condition is not disabling if the symptoms are reasonably controlled by medication or treatment).  The ALJ also noted (Tr. 25) that, while Dr. Wessells assigned C.C.M. a GAF score of 45 to 50 in May 2005, indicating severe symptoms or limitation, by February 2006, C.C.M.'s GAF score had increased to 62, indicating only mild symptoms, a definite improvement in his condition.  While a State agency psychological consultant found in April 2005 that C.C.M. had no limitations in the domain of health and physical well-being, the ALJ considered the fact that C.C.M. takes psychotropic medications on a daily basis and attends therapy every two weeks and also considered the plaintiff's testimony regarding C.C.M.'s emotional outbursts (Tr. 25).  Considering all the evidence, the ALJ found the evidence supported a less than marked limitation in this domain.  Based upon the foregoing, substantial evidence supports the finding.

As argued by the defendant, the ALJ provided specific, legitimate reasons for his conclusions (Tr. 15-26), and substantial evidence supports the finding that C.C.M. did not have a "marked" limitation in two areas of functioning or an "extreme" limitation in one area of functioning so as to functionally equal a listed impairment (Tr. 25).  *See* 20 C.F.R. § 416.926a.

### Consultative Examination

The plaintiff argues that the ALJ was required to obtain a consultative examination to evaluate C.C.M. for bipolar disorder because of his strong family history for the disorder and because C.C.M. met, medically equaled, and functionally equaled Listing 112.04 for bipolar disorder.  Here, the ALJ concluded the medical and nonmedical evidence

22

of record was sufficient to support a finding that C.C.M.'s impairments, although severe, were not severe enough to meet, medically equal, or functionally equal a listed impairment. As discussed above, C.C.M. did not satisfy the requirements in both A and B under section 112.04 to meet that listing. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.04. Substantial evidence supports the ALJ's finding that C.C.M. did not have a "marked" limitation in at least two of the appropriate age-group criteria in paragraph B2 of 112.02. Furthermore, substantial evidence supports the finding that C.C.M. did not have at least two "marked" limitations or one "extreme" limitation in the domain of functioning or development to functionally equal a listed impairment. Notably, not one of C.C.M.'s treating or examining physician's opined that his impairments met, medically equaled, or functionally equaled a listed impairment. Since the evidence as a whole was sufficient for the ALJ to make a determination about C.C.M.'s mental condition, the ALJ was not required to obtain an additional consultative examination. *See* 20 C.F.R. § 416.919a(b).

The plaintiff further argues that the Appeals Council erred by not remanding the ALJ's decision to allow for a consultative evaluation for bipolar disorder, in light of the evidence submitted to it. The Appeals Council must consider evidence submitted with a request for review if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *See Wilkins v. Sec'y, Dept. of Health and Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative. *See id.* In its order denying review of the ALJ's decision, the Appeals Council specifically noted:

> In looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative law Judge's decision. The Appeals Council notes that some of the material submitted by your representative duplicates material previously entered into the record as Exhibits 4B, 12E, and 12F. Since this material duplicates that

23

> previously entered into the record, the Council has not entered
> it as an Appeal Council exhibit.

(Tr. 5-6).  The evidence submitted by the plaintiff was not material, i.e., it would not have changed the outcome of the ALJ's decision.  While the evidence showed that C.C.M. had some behavioral problems, that same evidence showed that his behavior stabilized with medication adjustments.  *See Gross*, 785 F.2d at 1166 (a condition is not disabling if the symptoms are reasonably controlled by medication or treatment).  In addition, as late as August 2006, Mr. Godbey assigned C.C.M. a GAF score of 62, indicating only mild symptoms (Tr. 238).  Contrary to the plaintiff's argument, the Appeals Council considered the additional evidence, but decided that it would not provide a basis for changing the ALJ's decision, and that a consultative examination was not needed.  Accordingly, the plaintiff's argument fails.


### Medical Evidence and Records

The plaintiff argues that the ALJ mischaracterized the evidence by stating that C.C.M.'s pre-kindergarten teacher indicated no serious concerns in the functions of attending and completing tasks and interacting and relating with others (Tr. 20-21).  On December 20, 2004, the claimant's pre-kindergarten teacher from Ridgely Elementary completed a teacher questionnaire indicating that the claimant had no problems in these domains (Tr. 124-31).  However, the exhibit cited by the ALJ is actually the questionnaire completed by Ms. Clendaniel, the claimant's Head Start teacher, in March 2005 (Tr. 137-44).  As discussed above, Ms. Clendaniel opined that C.C.M. had obvious problems, when medicated, in this domain in refocusing to task when necessary, waiting to take turns, changing from one activity to another, and working without distracting himself or others (Tr. 139).  However, the ALJ did not give controlling weight to Ms. Clendaniel's opinion because the questionnaire was completed prior to a change in medication, and treatment notes

documented improvement in C.C.M.'s behavior with this medication.  As for the function of interacting and relating with others, both the pre-kindergarten teacher and Ms. Clendaniel opined that C.C.M. had no problems with the activities listed in this domain (Tr. 127, 140). This court finds that while the ALJ may have referred to the wrong exhibit number, the ALJ did provide specific, legitimate reasons for the conclusions, and substantial evidence supports the findings.

## CONCLUSION AND RECOMMENDATION

This court has considered the entire record and finds that the ALJ's decision that the claimant is not disabled is based upon substantial evidence.  Based upon the foregoing, this court recommends the decision of the Commissioner be affirmed.


s/William M. Catoe
United States Magistrate Judge


July 1, 2008

Greenville, South Carolina